Our next case for today is 2020-50003, Leigh Ann H. as parent, guardian, next friend of K.S. and K.S. individually v. Riesel Independent School District. You may proceed. May it please the court, my name is Elizabeth Angela and I'm appearing on behalf of appellants today. The central issue raised by appellants is whether Chris received a FAPE consistent with the IDEA. Of the six sub-issues raised by appellants, I'll be discussing the issue of child find. The district court erred by placing the child find obligation squarely onto the parent's shoulder and erred in its determination that Riesel did not have reason to suspect that Chris was a child with a disability prior to parental request and despite Chris's significant and long-standing history of academic failures and his history of serious and explosive behaviors which resulted in multiple disciplinary referrals, suspensions, and long-term disciplinary removals. Without the necessary behavioral supports and special education services in place, Chris's academic failures and behaviors only increased when Chris entered high school as a ninth grader. But Riesel was required to do more than sit idly by, awaiting for the parent of an eligible disabled child to contact it, yet this is precisely what Riesel did here. Therefore, appellants ask this court to reverse the decision of the district court and remand this case for a determination of appropriate remedy. Child find... Counsel, I have a question. You argue that KS's subsequent IEP was not individualized as required under the IDEA and that KS was only given services available to all students. That makes no sense to me. You may need to help me because the existence of an IEP means that he has received at least one service unavailable to other students. Can you help with that? He's supposed to receive at least one service that is not available to other students. However, in this case, the only service Chris received specifically was 15 minutes of consult time per six weeks. The special education case manager said she used that 15 minutes per six weeks to merely check his grades and report on his status. That is not specially designed instruction as the IDEA defines it. The essence of special education is specially designed instruction to meet the child's unique needs that result from the child's disability, which is supported by services that will permit him to benefit from the instruction. Individualization was the appellant expecting a one-on-one personal teacher. I don't know that the disability, I don't know the record we have would show that. Well, based on his evaluations, your honor, he was anywhere between five and six years below his grade level in reading. He was also several grade levels below his level in mathematics. I don't know that Chris would necessarily require a one-on-one aid or one-on-one assistance. However, he did require individualized instruction to address his reading deficits and his math deficits. I was not on the ARD committee, obviously, so I don't know if that means that he was to get 30 minutes of one-on-one reading instruction per week or if he was going to get a small group instruction to specifically target his reading disability. But in this case, he received nothing other than general education accommodations, which are available to all students and can never supplant individualized instruction, although they might be used to support individualized instruction. Well, I don't think every student got that 15, I'm not, I understand you think that they needed more, but that 15 minute thing isn't individualized, isn't it? If it's individualized monitoring, it is not individualized instruction. Right, but the monitoring itself is something that he got that the other students didn't, right? That's correct. Okay. If there was an evaluation done in 2009 that indicated that KS had a disability, why was it until 2016 that the school became aware of it? Or maybe that's not a correct understanding of the facts. That was a disputed fact, Your Honor. Leanne H., the parent, indicated that she had provided the evaluation to Riesl when Chris was in fourth grade. However, that's not in the record. But, I mean, why wouldn't it have been just reiterated over and over until finally he was getting the, if the situation was getting worse and worse every year? There was testimony that the parent was very cooperative and was screaming to the high heavens that Chris was having difficulties and needed more assistance. However, the district never took steps to evaluate him or provide him with the assistance he needed, including even providing response to intervention under general education. You may proceed with the rest of your argument unless someone has a question. The court held in Krawitz that a child find violation under the IDEA turns on three inquiries. The date that the district's child find duty was triggered, the date the district initiated the evaluation, and the reasonableness of the delay between the two. However, the district court erred in finding that the child find obligation is triggered under three entirely different circumstances. First, when the parent expresses concern in writing, if the parent requests an evaluation, and if the school expresses specific concerns about the child. The court's reasoning was flawed by its legal error in confusing the child find reasonable suspicion standard found under 20 U.S.C. 1412 with the procedural protections for a child not yet found IDEA eligible, but who's suspected of having a disability and is facing a removal under 1415K. Thus, the court erred in creating a new standard, finding that a written request for evaluation is the controlling factor in child find, when the key is actually the lower threshold of reasonable suspicion. The court then erred in finding that appellates did not meet their burden to show that Chris's star scores triggered defendant's child find duty. Aside from the court's factual error in finding Chris passed all of his state assessments in 7th and 8th grade, Chris's repeated failures on state assessments were not alleged as the sole child find factor, but rather as one of the several child find triggers that Riesel ignored. Are you using your client's name in this proceeding? Do we have initials and things? Are we supposed to? Is that because he's not a minor, or are we supposed to be using his name? We want to respect the situation. He is now an adult, and I did check with him, and using his first name is okay with him. Okay. Could you tell us what relief you're specifically seeking? There was testimony during the hearing that Chris required individualized tutoring for reading and mathematics, and in addition to the individualized tutoring, because of his behaviors, he was going to require some vocational coaching and transitional living services. So for Chris, what he wants and what he's asked for is that they teach him. So he would require some tutoring in reading, because his skills are significantly below functioning level, and for mathematics, basic mathematics skills, in addition to being provided with a vocational coach and vocational counseling. And that's done after graduation routinely as part of the provisions of the proper education? Yes, ma'am, that is correct. The school district can either provide those services, but more often than not, courts will ask them to fund it, and the parent will find the provider. And those have been asked for and declined? Yes, ma'am. Specifically, those future services have been asked for and declined? They were asked for during the hearing, and shortly thereafter, as this case worked its way up, that he be provided, I can't remember specifically on the vocational services, but certainly on the private tutoring services for math and reading. Well, that's kind of my question. If that kind of evolved as the case progressed, then are those actually part of the complaint, or would that be a new proceeding, that he's not getting the services he needs now, and this case here is about the services he didn't get in the past? I'm confused on that. Well, the remedies under the IDEA are to compensate a child for services they should have received, but did not receive. So we're asking that the services he did not receive in 9th, 10th grade, before we had the hearing, be compensated through private tutoring and through these vocational services. So this is just a remedy you're seeking? This is not a complaint that he should have gotten these after-graduation services and didn't get them? That is not for us? That's correct. Okay. Thank you. Anything further that you have? You have a little bit of time. How much time do I have? You have 32 seconds. No, I will just conclude on that, Your Honor. The district court erred in finding that Chris's multiple academic failures and his concerning and alarming behaviors did not rise to the level of a mere suspicion of disability, which triggered Riesel's child-fine duty well before parental request. Because Riesel failed in his child-fine duty, it failed Chris, and Chris is entitled to remedy for Riesel's failure to timely fulfill its child-fine obligation to him, as it denied Chris the fate. Thank you. Thank you very much. You've saved time for rebuttal. Mr. Duke, you have seven minutes, sir. And you're on mute. Thank you, Your Honor. Brandon Duke on behalf of Amici Disability Rights Texas and COPA. To ensure that a free and appropriate public education is secured for each student, the primary ideological underpinning of IDA is to turn the key stakeholders, parents and the students, into advocates. Indeed, the success of IDA can be attributed to that focus on increasing participation in the development and design of an individualized education plan for each student. In our briefs, Amici focused on two specific failures by Riesel. First, the district's decision to hold the August MDR without KS denied him his right to participate and deprived him of educational benefits. And second, the district's failure to provide KS with appropriate transition services. You're on mute. Mute. You're mute, sir, somehow. I am so sorry, but you're on mute. We can't hear you, Mr. Duke. We still can't hear you, Mr. Duke. Stop his time so it's not expiring, please. Mr. Duke, let's see if we can hear you. I think he's trying. Are you there? Oh, wait a second. I thought something happened then. Oh, Mr. Duke, try again. Hello? Yes, you're there. When did I cut out? You talked about the deny the right to participation and then this other denial, but we didn't hear anything after that. Yeah, I had a computer shut down and then I noticed Dr. Duncan making a face and I understood you probably couldn't see me. We really have about six minutes and 15 seconds. But before you get your time started again, can you address if we agree with you that he was denied his right to participate? Does that mean we reverse this case or is there? I guess we should ask Ms. Walker that, but what happens if we agree with you on your points? Well, we think that the ultimate remedy here should be reversed and remanded for further consideration at the special education hearing. But I guess our larger point and what I would have ended with, but I'll return to now, is that here we've seen a series of procedural violations. And the Supreme Court has emphasized that the importance of compliance with IDA's procedures and reviewing courts are supposed to do more than just make sure that the district checks certain boxes. And NJRF, the Supreme Court, explicitly rejected the argument that the procedures alone were not substantive rules. And in fact, Judge Roberts said that it's not just a checklist of items that the IEP must address. So, Mr. Duke, on the first procedural violation was that Chris was not at the August NDR. Is that right? Well, for our briefing, yes. I would also defer to. Sure. Yeah, but it's about the child found problems as well. Am I getting this right? It's because he was 18. If he had not been 18, then the parents could have sort of could have advocated for him. Well, it is the trigger. That's correct. But it's the statutory design in both under Texas law. The federal code and IDA makes clear that it's both the right of the parent and the student to participate before the child's 18. That right is enveloped by the parent. But once it becomes 18, that right transfers to him. And so so reasons for that as well. It makes it important. Does everybody agree that that was a procedural error? I believe that's I don't see it. I thought everybody agreed that it was. So then the question is, is it actionable? Right. Don't we have to take a further step once we say it's a procedural problem? Then we have to figure out whether it's actionable or not. Right. That's correct. And the determination that the court was supposed to apply was to figure out whether or not that procedural violation would have resulted in a different conclusion. I'm sorry, a would have made an impact during the MDR, as opposed to what the court applied below, was whether or not a different conclusion would have been reached. And our briefs are set for a number of reasons why being involved would have made an impact on the proceeding. One, his involvement, he would have been able to provide his input in the process. Making that determination. I mean, I understand he was excluded and ostensibly everyone agrees he shouldn't have been. But can we look at what actually happened during the I mean, the parents were there, right? That's correct. We look at the substance of what actually got done and discussed or for the second prong. What I'm struggling with is we say there's a procedural violation because he wasn't there. But then do we have to assume that because he wasn't there, he just nothing, nothing was, you know, his rights were violated. Not that the proceeding, you know, didn't adequately consider what it should have done. I'm trying to figure out how we make the second step. Well, I think what the second standard is, and I'll find the language because the court was correct and below and describing the standard. It's whether or not the violation impacted the decision making process, which put in a deprivation of an educational opportunity. And here the impact would have been his role in participating, but also his ability to contribute to the conversation, provide more explanation, but also understand the process. And as we've detailed, students who are invited to that process, one have more buy in, understand the basis is for it. And that alone provides impact. And then also just under your case law, both under the Plano case that was before the circuit and others, not including stakeholders. In those cases, former teachers or other school district officials alone was sufficient to show that there would have been an impact. We think it's clear that not including the student who had a right to participate also meets that standard. So then I'll turn to a second, just brief issue with the MDR, which related to the MDR's failure to review all evaluation data, which included the student's behavior and discipline history. The records here are replete with incidences across settings and times of students' impulsive, explosive, and sometimes violent responses towards both teachers and peers. And the failure to review and include that as part of the MDR process also would have impacted or was a failure, procedural violation, but resulted in a substantive impact on the decision making process. Could I ask a follow up question? Yes. If we were to remand, do we remand to the district court to explore these issues or do we remand for the proper process to take place? Well, I think I think most directly you would remand to the district court because that's where the proceedings would there actually be further proceedings or would they be instructed to that? That there's that there are viable issues that need to be explored in the proper educational forum. Well, I think ultimately that would be the decision. You would vacate the decision below and remand for further proceedings. And those proceedings would be returning to the educational process to make sure that these procedural violations are addressed and how they would be addressed is either the relief stopped by the plan or further proceedings during the administrative process. Because were these violent episodes included as part of a mental health aspect of this? So the district was aware of documented diagnosis of ADHD, bipolar disorder, mood disorder, and I think there's sites in the records and the appellant's brief. And then also the parent provided a doctor's note, which indicated numerous other mental health disabilities. And then the district itself was aware because he was a student in their school district for several years. Did they make efforts to accommodate his education to help deal with his increasing frustration? There's nothing to indicate that in the record, but I defer to the party. OK, thank you, Mr. Duke. We have your argument. Ms. Walker, you may proceed and you might want to answer that question. Did the district take any steps to it's obviously they knew about it from the mom, regardless of whether they had that report and they knew about it from observed phenomenon. So I'll start with during KS's 10th grade year before the district referred him for a special education evaluation. He had 26 referrals for or for tardies and being late to class and not turning in work. And those 26 referrals dropped the next year after they implemented his IEP. And it went from 26 referrals to two referrals. And so once the district implemented his IEP, the supports and the services that were put in place for KS had an impact on his behavior, which is the fourth Michael F. Factor. When we're looking at whether we provided him with academic and non-academic benefit going from 26 referrals during 10th grade to two referrals during 11th grade is the epitome of non-academic benefit. And that's exactly what a school district wants to see when they implement an IEP for a student. And so when you also look, they also completed an FBA, which is a functional behavioral assessment during 2017. And when you look at the FBA that was conducted by diagnostician Debbie Tittle, and it's in the record, it shows that he the reports from the teachers did not reflect any serious behavioral issues or suggest behaviors that interfered with learning. That's at the record on appeal at 1502 through 1503. And like I said, at the time they did the FBA, he only had two disciplinary referrals. One was for excessive tardies, and the other was for inappropriate language. KS's teachers at that time were reporting he was having some difficulty with attention to task, but he was responding well to redirection. And they reported many positive behaviors, such as he was a good student. He was personable. He was doing well. He was good natured. He was asking questions when he didn't understand something. And so these behavioral issues that KS points out just were not existent in the school setting. And so the IEP did exactly what it needed to do, and it addressed the behaviors that they were seeing, which were the 26 referrals. What do you say of counsel's argument that the IEP wasn't individualized enough and that KS didn't receive any services that weren't generally available? Absolutely. That was where I was going next. When you look at his IEP, he had consultation services, and they were 15 minutes per six weeks grading period. And the special education teacher actually testified that she spent more than 15 weeks or more than 15 minutes, I apologize, per six weeks interacting with his general education teachers. And that included monitoring KS's progress, checking his grades, speaking with his teachers, and ensuring that his needs were met. General education students don't have access to somebody that's standing over them, making sure that they're getting their work turned in, making sure that their grades are where they need to be, monitoring their progress. As Judge Elrods pointed out, that doesn't exist for general education students. So he absolutely was receiving services that general education students do not receive. But more importantly, when you look at his IEP, it absolutely contained specialized instruction. In their opening brief, appellant actually said that KS's IEP contained general accommodations that may have adapted the content or delivery of instruction provided to KS. That was on page 33. That's the definition of special education under the IDEA. It's specially designed instruction that adapts the content, methodology, or delivery of instruction to address a student's unique needs. So when you look at his accommodations that were in his IEP, they absolutely adapted the delivery of instruction, and they adapted the content of instruction. For instance, his math teacher was to change the pace of instruction for KS. One of KS's disabilities under his specific learning disability was a need for math, and his math teacher was changing. That's not something general education students are going to get. His science teacher was clarifying and rewording complex questions and concepts, as well as clarifying complex text and questions. Again, adapting the content of instruction and adapting the delivery of instruction. And then the mere fact that he had goals to address the TEKS where he was lacking and where he needed help, that's the individualized nature of his IEP. And you can look at the record, and it shows that they were based on his present levels of performance. They had input from his teachers. They had input from his parents. KS attended his art committee meetings. He gave input on his IEP. And so we absolutely believe that his IEP was individualized based on his assessment and performance and provided him what he needed. Okay. I have a follow-up about that. Like in Renee J., KS wanted to be, had a skill. He wanted to be, Chris wanted to be a game warden, you know, and that was within reach. And I don't see in the record that any additional transition services were provided for KS to accomplish the goals of attending college and becoming a game warden. And so I'm concerned that the first Michael J. factor may favor Chris and also the, you know, I'm concerned that the factors may favor Chris. Yes. So when you look at Renee J., one thing the court needs to take into account is that the student in Renee J. had autism and intellectual disability with an IQ of 51 and ADHD. Here, KS was receiving an IEP in special education under the IDA as a student with a specific learning disability. The transition services that a student with a specific learning disability is going to need is going to differ greatly from the transition needs for a student with an intellectual disability or a student with autism. And the student in Renee J. had both. And so while they were providing that student with transition services that fit what she wanted to do, they were also providing other services. And the student was in a life skills class. There's no evidence in this case that KS needed a life skills class. He was a student with a specific learning disability. And so then what you have to look at is what does the IDA require for a transition plan? And when you look at it, it has to have appropriate and measurable transition goals. There's no dispute in this case that his goals were measurable. And the evidence in the record on appeal also shows that they were appropriate and they aligned with his interests. They provided him a path to pursue employment. And his IEP contained the high school courses and the accommodations and the goals he needed to meet those goals, which were to attend an institution of higher learning, to pursue a degree in criminal justice, and to seek employment as a game warden. He was also enrolled in a law enforcement class. He was enrolled in a wildlife, fish, and ecosystems class. What individualized things were done? Just enrolling in classes is not individualized. Well, when you look at the IDA, it specifically says that transition services include the course of study. Besides the course of study, what transition services were given to him? His IEP, his goals. For instance, there were certain TEKS that he was needing help on. And in order to pass end-of-course exams, which are required to graduate from high school, which was one of his goals, he needed to ensure that he knew the TEKS. And his goals were tailored to the TEKS to ensure that he was receiving the services he needed to match his TEKS. So that's absolutely individualized to help him meet his goals of graduating from high school, attending college, and pursuing a degree. What is very concerning to me in this record is that he was able to complete all of his coursework to graduate after only five days in alternative school. That is just shocking to me, that he was behind like this, and then all of a sudden he goes to five days of alternative class, and magically he's got all of his coursework. That is remarkable. Do you have anything to say about that? That issue, in the district's opinion, is not before the court because his receipt of a FAPE at the DAEP was not an issue before the hearing officer in the second hearing. The only issue before the hearing officer in the second hearing was whether the district complied with the IDA's requirements regarding the manifestation determination review. Okay, do you think a truly appropriate education can be completed on a computer in five days? Absolutely, kids are doing it right now. Five days for all of what you need for graduation when you're five years behind in reading, and you're behind in your, I mean, just. Absolutely, and he was not, he was not behind in reading. When you look at the evidence in the record on appeal, there's testimony from, and I want to find it because I want to make sure that I provide it to the court. There was testimony from the diagnostician, Barry Morgan, explaining that the fact that KS was able to pass his STAR test showed that he was absolutely on grade level. We do not deny that it took him a couple of tries to pass English 1 and English 2, but the fact that he was able to pass English 2 showed that he had the skills necessary to be on grade level and to graduate from high school. There's a difference between norm reference tests, which provide grade equivalency scores, which is what KS's experts pointing to, as opposed to STAR exams, which are criterion reference assessments, which reflect his ability to read grade level materials. And Barry Morgan, the diagnostician for the district, his testimony regarding that explanation is in the record on appeal at 2442 to 2443, and he provides a very good explanation as to why the district disagrees that he's not on grade level. So, yes, he absolutely had the skills necessary to complete his coursework. Counsel, can you address if there should be a remedy for the failure to allow him to participate in the meeting? There absolutely should not be because, as I believe Judge Duncan was pointing out, you have to have a procedural violation in order to be actionable needs one of three things. You have to have impeded his right to a free appropriate public education, you had to have impeded his opportunity to participate in the provision of a FAPE, or you had to cause a deprivation of educational benefits. I'll submit to the court that the only issue KS briefed for the court was the second one, whether it significantly impeded his opportunity to participate in the provision of a free appropriate public education. I guess my question to that one was, if everyone's agreeing that he should have been in the meeting, right, because he was 18, doesn't that sort of ipso facto mean he was significantly impeded in his opportunity to participate in the decision-making process? No, and the reason why is because there was a second MDR meeting that he did participate in in September of 2017. So immediately after that MDR team meeting took place, there was a second one. But when you look at this statute, it specifically… What does the record reflect that he did at the second meeting? The record reflects that he participated in decisions affecting his provision of FAPE, which included providing consent for additional evaluations, being present for the discussion regarding early graduation, being present to discuss the credits he needed to proceed accordingly. He also participated in prior art committee meetings, which impacted his IEP and the provision of FAPE. And he was able to voice and did in fact object to the manifestation decision reached at the August MDR at the September meeting he went to. And so… We're in your view to figure out whether the procedural violation was actionable under the statute. We need to look at the record, see what he actually did in the second meeting. And so we'll do… Of course, we'll do that to the extent we haven't already done it. But what are… In terms of what we're reviewing, what is… Is that a legal question, a factual question? What are we reviewing with respect to that? So your question before the court is, to your point, is whether it significantly impeded his opportunity to participate in the decision-making process regarding the provision of a free appropriate public education. And our position is that he hasn't exhausted his provision of FAPE at the DAEP. And even if it was exhausted, the IDA requires school districts to continue providing students assigned to a DAEP with a FAPE in accordance with their IEP. And nobody is disputing that his IEP could not be implemented at the DAEP. The only change was that instead of being in the general education environment at Riesel High School, he would be in the general education environment at the DAEP. His placement did not change. His transition plan did not change. His IEP did not change. So the MDR simply determined that instead of receiving his services at the high school, he was going to receive his services at the DAEP. That does not significantly impede the provision of a FAPE to him. Okay, thank you. There was a lot of acronyms. There was a lot of acronyms in those last sentences, I've got to say. We've handled these cases before, and the number of acronyms amazes me, but I am able to follow along. That's good. Well, and I should have defined DAEP, which was the district. I know what they mean. Yes, it's the alternative school, absolutely. Is there anything else, Ms. Walker? I did want to touch briefly on the child find issue, Judge Elrod. Just to state that what K.S. was showing with 26 referrals regarding refusing to do work and being tardy to class does not give rise to a suspicion of a disability as well as a suspicion for a need for special education. At most, it shows that he was engaging in delinquent behavior, which doesn't put a school district on notice. That's the Tracy case out of the District of South Carolina. There was the mother saying he's having emotional problems, and there was the one incident, at least, where the violent outburst. The violent outburst occurred shortly before or shortly after. I'm not sure which. I need to look. He was referred. It was within a reasonable time frame of him being referred for special education. He had these emotional problems, and we all know now how we may not have known in the past, but now we know that all these emotional frustrations can lead to poor academic performance. I don't believe that they've just pointed in the record where mom was raising all of these emotional issues. What they're arguing is that the star scores in his grades triggered child find and that his behavior triggered child find, but all of the evidence in the record on appeals shows that his teachers were reporting that he was functioning in the classroom just like any other student. With respect to his star scores, they were inconsistent at best, where he was passing classes but then maybe failing a star test or passing a star test but not applying himself in class. That's just simply not enough to trigger child find when you have to have a suspicion of a disability and a suspicion of a need for specially designed instruction. So for those reasons, the district would ask that the court uphold the district court's decision, finding that the district and finding in favor of the district for both due process appeals. Thank you, Miss Walker. We have your argument. You save time for rebuttal counsel. You're on mute. There we go. I want to first address the commentary regarding behaviors. Well, let me back up. There are two IEPs in question here. One in May of 2016 and another one in March of 2017, which each individually must be analyzed and give rise to two separate causes of action. So I want to make sure that that's clear. As to his behaviors, while he was in ninth grade, he did things like disrupt the class by asking his teacher if he watched gay porn to get a rise out of the class. Chris also yelled at another teacher because she was, quote, pissing him off. Towards the end of his ninth grade year, Chris had another serious altercation with the athletic director for which he was going to be sent to the DAEP. However, the disciplinary placement was full and couldn't take him. In 10th, excuse me, 11th grade in January of 2017, after both the May 2016 IEP was implemented and the March 2017 IEP, there was a significant and serious altercation with a teacher, Mr. Teeter, where Mr. Teeter said he charged him. He approached him. He was punching wall. And Mr. Teeter, who is not a small man, was actually afraid that Chris assault him and he might have to restrain him so that his behaviors did not decrease. His behaviors actually continued to escalate. As to the specially designed instruction, the court erred in finding that Chris's general education accommodations adapted the delivery of instruction because changing the pace of instruction as well as rewording was considered an individualized instruction. Basically what that says is if Chris raises his hand in class and has to ask a question or ask for clarification, then that would be considered individualized instruction when it's not. Adapting the delivery of instruction under the IDEA means to provide the student with delivery adaptations that general education students don't have access to. For example, for a student like Chris who reads below grade level due to his disability, perhaps the science teacher would give him reading materials at his instructional level so that his reading disability doesn't negatively impact his access to science. Rewording, if he asks a question in the middle of class, is not specialized instruction. Excusing Riesel from providing specialized instruction, the court would essentially permit Riesel to circumvent the purpose of the IDEA by socially promoting Chris into mainstream curriculum without addressing the individualized needs of his respective disabilities, which defeats the entire purpose of the IDEA. As to standardized testing results, numerous courts have held that standardized testing results because they measure skills and not curriculum are appropriate measures for determining if a student did make progress under his IEP. In this case, when Chris was assessed in basic reading fluency in May of 2016, he had a standard score of 87, which is between a range of 5th and 8th grade. In February 2017, when the district re-evaluated his scores, he remained stagnant and actually dropped a point. When Dr. Doan evaluated him in March of 2017, his standard score decreased to an 81. That is not progress. The same can be said for his math problem solving. He went from a 91 in February to an 86 in, excuse me, a 91 in May, an 86 in February, and then an 84 when Dr. Doan assessed him in March. Counsel, you need to wrap it up because your time is up. I will conclude. Thank you. Okay, thank you very much. We appreciate counsel appearing virtually for these arguments. The case is hereby submitted. We appreciate it. We're going to take a five minute break before considering the next case.